IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEFFREY L. JOHNSON, | § | |
| | § | |
| Plaintiff, | § | C.A. No. _____ |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| SIDNEY GALL, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Jeffrey L. Johnson ("Plaintiff"), brings this action against Sidney Gall ("Gall" or "Defendant"), and in support hereof, Plaintiff respectfully shows the following:

### PARTIES

1. Plaintiff is an individual residing in Houston, Texas.

2. Sidney Gall is an individual believed to be residing in New Mexico. Gall does business in Texas, but does not keep a registered agent in Texas. As such, Gall can be served via the Secretary of State of Texas or at his New Mexico residence. Upon information and belief, Gall's last known public address is 3436 Del Agua Ct., Albuquerque, NM 87111.

### JURISDICTION

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441.

4. This Court has personal jurisdiction over Gall. Upon information and belief, Gall conducts business in this State and solicited the funds from Plaintiff in this jurisdiction and the funds were deposited at Gall's request and on behalf of Gall to a bank account in this jurisdiction. Upon information and belief, Gall has solicited funds from others in this jurisdiction for the same "investment" described and alleged herein. Further, upon information

and belief, Gall is the sole proprietor of Texon Entertainment, Inc. ("Texon"), which is incorporated in the State of Texas and has its principal place of business in this jurisdiction.

5. Plaintiff seeks damages that meet the jurisdictional limits of this Court.

## VENUE

6. Venue is proper in this Court under 28 U.S.C. § 1400(b) because Gall does business in this State and in this District. In addition, venue is proper in this Court under 28 U.S.C. §§ 1391(b)-(c) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## BACKGROUND

7. At all times relevant to this Complaint, 2012 to present, Plaintiff was a resident of Houston, Texas in Harris County, Texas. Plaintiff met Gall by chance. Gall introduced himself to Plaintiff and represented himself as a business person within the entertainment industry. Gall represented that he was in the business of making money for people by putting together deals for films and other business ventures. Over time, Gall made numerous factual representations to support his involvement in the entertainment industry.

8. Gall represented to Plaintiff that, among other things: (1) he was a graduate of Boalt Law School at the University of California Berkeley where he had taught classes; (2) he had practiced criminal law for many years in California; (3) he was friends with many well-known people in the entertainment industry, such as, Morgan Freeman, Adam Sandler, Johnny Depp, Steven Spielberg, Jessica Biel, Robert Englund; (4) he was friends with many powerful people, such as, Bill Clinton, Gordon Bethune; (5) he was a former Director on the Board for Continental Airlines; (6) he was a Rhodes scholar; (7) he owns interests in restaurants in Houston; (8) he owned property in California (a home he claimed to have sold in 2013 for over

$10,000,000), New Mexico (his private residence) and Italy (a home he owned with a former partner now friend in Tuscany). No public records have been found to support any of the representations in this paragraph.

9. Gall represented that his first endeavor into the movie production business was with the movie *Meatballs*. He represented that he recently had had great success on the movie *Paul Blart: Mall Cop*. Gall represented that he purchased the rights to the movie for $300,000 and had sold interests to investors to get the movie produced. Gall represented that he retained a 12% share in the movie and that Adam Sandler had a 10% share. Gall claimed that the movie had made over $500,000,000 and that based on his 12% share he had received royalties over $60,000,000. No public records have been found to support any of the representations in this paragraph.

10. Gall also represented that he had produced a movie featuring Robert Downey Jr. titled *Charlie Bartlett*. Public records indicate that a company operating as Texon Entertainment, Inc., was part of the production effort for the movie. Gall represented that this was the same Texon Entertainment, Inc., that he owns.

11. Gall represented that he was currently working on several projects, including but not limited to: (1) a new game show for television involving crosswords, in which he had hired a foreign model/actress to be the emcee and was spending over $350,000 to build a set for the pilot; (2) several new serial television programs, including but not limited to, Red Notice and Swamp Patrol; (3) several new feature films, including but not limited to, Solar Man (a comic book superhero, which he owned the exclusive rights to), a horror film written by Robert Englund, and Howdy Neighbor (a comedy, which he owned the exclusive rights). Gall represented that he would create an investment opportunity for Plaintiff on these projects.

12.     Gall invited Plaintiff to a meeting with Barry Rosen and Eric McCoy in Miami, Florida.  Gall told Plaintiff that Messrs. Rosen and McCoy were working (filming episodes) on several projects for Gall, including Swamp Patrol and Red Notice, which were described as TV serials.  Mr. Rosen and Gall discussed several projects, including Swamp Patrol.  Gall provided "treatments" and some budget documents regarding Swamp Patrol.  Gall offered that Plaintiff could be involved (in some capacity as producer) in those projects when they were ready to be marketed to studios.  As of January 28, 2015, Gall continued to make such offers to Plaintiff and represented that the only reason those serials were not completed was because the editor for the productions had died of a heart attack.

13.     Gall provided Plaintiff with scripts allegedly from Jamie Foxx or on his behalf as additional investment opportunities and evidence of Gall's involvement in the entertainment industry.  One such script was titled "Ladies Night Out."

14.     Gall invited Plaintiff to meet with Irv Hollander.  Plaintiff met with Mr. Hollander on two occasions in the Los Angeles area.  Gall represented that he had been in business with Hollander as part of a company called Multicom Entertainment Group, Inc. ("Multicom").  Gall presented Plaintiff with a Multicom business card listing "Sid Gall" as "Executive Producer."  Gall represented that he had met Hollander many years earlier when Gall was a criminal attorney and Gall represented Hollander.

15.     Gall represented that Hollander was now in the business of purchasing libraries of television shows and films, which would then be packaged and sold to foreign markets in need of such programming.  Gall represented that Plaintiff could be part of those investments.  On one occasion, Hollander offered to take Plaintiff to a warehouse of his inventory (television and film libraries).  Plaintiff was instructed not to ask questions, or otherwise "bother" Hollander.

Hollander drove Gall and Plaintiff to a warehouse filled with reels and tapes and other forms of recorded television and films programming. Nothing was discussed. Gall later represented that Hollander and him were in negotiations for Gall to invest in that space and those libraries.

16. On multiple occasions, Gall organized meetings between Plaintiff and Douglas Hitt. Gall represented that he was investing a substantial amount of money in a business venture with Mr. Hitt regarding surgical robotics. Gall promised to include Plaintiff in such investment. Upon information and belief, Gall never invested in Mr. Hitt's business, but continued to make promises to Mr. Hitt that he would. Upon information and belief, Gall solicited funds from Mr. Hitt to invest in the same "bridge loan" type arrangement that Gall solicited funds for from Plaintiff identified herein.

17. On multiple occasions, Gall engaged Julie Gall to interact with Plaintiff. On at least one occasion, Julie Gall was present at an in-person meeting. Plaintiff's participation in the bridge loan and various projects was discussed. Upon information and belief, Julie Gall was fully aware of Plaintiff's investments made with Gall.

18. Gall paid for hotel rooms for Plaintiff at some of said meetings identified herein, representing that he had significant accounts and history with Hyatt Hotels and Resorts, including significant amounts of reward points.

19. Gall represented that he frequently donated large numbers of United Airline reward miles to charitable organizations.

20. Based on the above representations, Gall alleged that he was well known in the entertainment industry. Further, Gall represented that based on his involvement and reputation in the entertainment industry, studio executives would come to him for "bridge" loans that they would charge to investors and use the funds to live a more lavish lifestyle. Gall represented that

the bridge loans were typically for approximately $3,000,0000 with short (12 month) terms at approximately 10%-12% interest. He explained that paying late would add an additional quarter percent to the rate and that the studios always paid late.

21. Gall invited Plaintiff to invest in the bridge loans as a way to get into the industry. Gall represented to Plaintiff that a new bridge loan was pending and could invest in. The alleged bridge loan was for $3.25M with a 12-month term and an interest rate of 10.25%. Gall represented that the alleged due date was July 2014. Gall explained that the studios usually pay one month late, which (1) would raise the interest rate by one-quarter percent, and (2) make the due date August 2014.

22. Based on the representations made by Gall, the introductions to Messrs. Hitt, Hollander, Rosen, McCoy and others, and Gall providing the various documents associated with "Swamp People," "Red Notice," "Ladies Night Out," Plaintiff agreed to invest in the pending bridge loan. Gall instructed Plaintiff to deposit the money into his bank account. Later Plaintiff learned that the bank account actually belonged to Texon. In all, Plaintiff deposited his personal funds into the bank account instructed by Gall on or before July 1, 2013. The entire amount invested was to be applied to the bridge loan investment.

23. Gall represented that after all the money was collected from investors, the "brokerage" firm that handled the transaction would provide paperwork for signatures. Gall never presented any paperwork. After repeated requests for paperwork, Gall responded that he had meant that Gall would be the only one on the paperwork and would distribute the money to the investors. Gall also represented that the only three investors on this particular bridge loan were Plaintiff, Gall and Gall's son.

24. Plaintiff demanded the return of his money in December 2013. Gall made repeated promises that he would return the investment. Gall has made repeated assertions that "the check is in the mail." However, the money has never been returned.

25. At Gall's request, Plaintiff waited for the "bridge loan" to mature to receive the return of investment plus the earned interest. The maturity date of August 2014 has passed. Gall still has not returned any of Plaintiff's money.

26. Gall represented numerous problems in getting the money from the bridge loan from the unidentified broker as an excuse for why the money had not been returned after the August due date.

27. Gall has represented that he received Plaintiff's distribution from the bridge loan in full on or about January 15, 2015. Gall represented that he deposited Plaintiff's distribution in a bank account at an unidentified credit union in Albuquerque, New Mexico. Gall has made repeated promises that "the money is coming," but as of the date of this action, Gall has not returned any of Plaintiff's money or the interest earned.

28. Gall represented that his wife, Julie Gall, mailed Plaintiff a check on January 29, 2015. To date, no check has arrived. Upon information and belief, no check from Gall or his wife to Plaintiff was ever mailed.

29. Plaintiff has made numerous requests to Gall for the identification of any of the alleged parties involved, e.g., (1) the parties involved in the bridge loan, (2) the alleged brokerage firm, (3) any of Gall's employees, and (4) the credit union. Gall has steadfastly refused to provide Plaintiff with any identification. Gall has never provided any evidence that an actual bridge loan ever took place.

30. Gall has never provided any evidence that Plaintiff's funds were actually invested in the investment for which they were solicited.

31. Plaintiff has discovered that Gall was previously sued by various parties. At least one such lawsuit was based on the same type of wrongdoing alleged herein, namely, soliciting funds for a false investment scheme. *Judith Cross v. Sidney Gall*, o. 2002-07683 (165th Judicial District, Harris County, Texas). In that lawsuit, Judith Cross provided money to Gall under similar circumstances as described herein. A Final Judgment was entered on May 21, 2003, in that case awarding Judith Cross the following: Compensatory damages $201,310, Attorney fees through trial and collection of judgment, $15,000, Attorney's fees for each appeal in which Plaintiff is successful, $5,000, Additional damages awarded for deceptive trade practices and/or fraud $402,620, and postjudgment interest at 10% per annum until paid.

32. Upon information and belief, Gall solicited funds from Douglas Hitt, a resident of California, for the same alleged bridge loan type investment presented to Plaintiff.

33. Gall introduced Plaintiff to a Sara Kim. Upon information and belief, Gall solicited funds from Sara Kim for the same alleged bridge loan type investment presented to Plaintiff.

**FIRST CLAIM**
**(Conversion)**

34. The allegations of paragraphs 1-33 are incorporated herein by reference.

35. The conduct of Gall set forth above in making unauthorized use of funds delivered to him for investment purposes by Plaintiff constitutes common law conversion of Plaintiff's funds.

36. Plaintiff deposited funds into an account at the instruction of Gall for investment into the alleged bridge loan investment offered by Gall. Gall was charged with safekeeping the funds and investing the funds into the specific bridge loan presented by Gall.

37. The funds deposited did not and do not belong to Gall and were at the time of deposit the personal funds of Plaintiff.

38. Gall continues to hold Plaintiff's funds. As such, Gall has wrongfully taken dominion and control over monies that are rightfully Plaintiff's.

39. As a result of Gall's conversion, Plaintiff has suffered significant damages.

40. Gall's conduct was willful, purposeful, and malicious such that punitive and/or exemplary damages are appropriate.

41. Gall's pattern of behavior, as evidenced by similar fraud and/or conversion against at least Judith Cross, even after being charged with a punitive award for such behavior, is egregious, such that an enhanced punitive and/or exemplary award is appropriate.

42. Gall's conduct constitutes constructive fraud.

43. Plaintiff has been harmed by being deprived of his funds.

## SECOND CLAIM
**(Money had and received)**

44. The allegations of paragraphs 1-43 are incorporated herein by reference.

45. The conduct of Gall set forth above is an unauthorized use and/or taking of money had and received.

46. Plaintiff deposited funds into an account at the instruction of Gall for investment into the alleged bridge loan investment offered by Gall. Gall was charged with safekeeping the funds and investing the funds into the specific bridge loan presented by Gall.

47. The funds deposited did not and do not belong to Gall and were at the time of deposit the personal funds of Plaintiff.

48. Gall continues to hold Plaintiff's funds.

49. The funds held by Gall belong to Plaintiff.

50. Plaintiff has been harmed by being deprived of his funds.

## THIRD CLAIM
### (Common Law Fraud)

51. The allegations of paragraphs 1-50 are incorporated herein by reference.

52. The conduct of Gall set forth above herein constitutes common fraud.

53. Gall made multiple, material representations to Plaintiff.

54. Statements made by Gall in order to induce Plaintiff to provide funds for investment purposes were false, and were known to be false by Gall when they were made or were made recklessly.

55. Such statements were made with the intent that Plaintiff would act on them, and he did act on them to his harm and detriment suffering damages as a result.

56. Gall's conduct was willful, purposeful, and malicious such that punitive and/or exemplary damages are appropriate.

57. Gall's pattern of behavior, as evidenced by similar fraud against at least Judith Cross, even after being charged with a punitive award for such behavior, is egregious, such that an enhanced punitive and/or exemplary award is appropriate.

## FOURTH CLAIM
### (Breach of Contract)

58. The allegations of paragraphs 1-57 are incorporated herein by reference.

59. Gall and Plaintiff had a valid and enforceable contract with Gall under which Gall was required to invest funds for Plaintiff and manage those funds as promised. Gall materially breached its contract with Plaintiff by failing to perform entirely. Gall breached his duties owed to Plaintiff, proximately causing him harm and damage.

## FIFTH CLAIM
### (Theft)

60. The allegations of paragraphs 1-59 are incorporated herein by reference.

61. Plaintiff deposited personal funds into an bank account of Gall's (as instructed by Gall) for investment into the alleged bridge loan investment offered by Gall. Gall was charged with safekeeping the funds and investing the funds into the specific bridge loan investment presented by Gall.

62. The funds deposited did not and do not belong to Gall and were at the time of deposit the personal funds of Plaintiff.

63. Gall continues to unlawfully appropriated, secured or stole Plaintiff's funds. The funds held by Gall belong to Plaintiff.

64. Gall took Plaintiff's funds with the intent to deprive Plaintiff of such funds and/or avoid paying Plaintiff.

65. Plaintiff has been harmed by being deprived of his funds and/or Gall's avoidance of payment. Gall's conduct was willful, purposeful, and malicious such that punitive and/or exemplary damages are appropriate.

66. Gall's pattern of behavior, as evidenced by similar fraud and/or theft against at least Judith Cross, even after being charged with a punitive award for such behavior, is egregious, such that an enhanced punitive and/or exemplary award is appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.  enter judgment for Plaintiff on all causes of action asserted herein;

B.  award damages adequate to compensate Plaintiff;

C.  award exemplary damages to Plaintiff of no less than $500,000;

D.  award pre-judgment and post-judgment interest;

E.  award Plaintiff its attorneys' fees and costs (including expert fees); and

F.  award Plaintiff such other and further relief as this Court may deem just and proper.

Date:  May 11, 2015

Respectfully submitted,

*/s/ Jeffrey L. Johnson*
Jeffrey L. Johnson, *pro se*
State Bar No. 24029638
1000 Louisiana, Suite 2800
Houston, TX 77002
713-425-8445
713-300-6045 – facsimile